# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| BARBARA BALFOUR, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | Case No. 05-2086-KHV |
| | ) | |
| MEDICALODGES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER AND ORDER TO SHOW CAUSE

Barbara Balfour, Patricia Clayborn, Barbara Gatson and Rhonda Williams bring suit against Medicalodges, Inc. alleging various theories of wrongful discharge under Kansas common law and discriminatory and/or retaliatory discharge in violation of 42 U.S.C. § 1981. This matter is before the Court on Defendant's Motion For Partial Summary Judgment [Plaintiff Barbara Gatson] (Doc. #188), Defendant's Motion For Partial Summary Judgment [Plaintiff Barbara Balfour] (Doc. #191), Defendant's Motion For Partial Summary Judgment [Plaintiff Rhonda Williams] (Doc. #193) and Defendant's Motion For Partial Summary Judgment [Plaintiff Patricia Clayborn] (Doc. #195), all filed August 29, 2006. For the reasons below, the Court sustains the motions with regard to Clayborn and Williams and sustains in part the motions with regard to Balfour and Gatson.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); accord Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."  Anderson, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence.  Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991).  Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated §., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  The nonmoving party may not rest on her pleadings but must set forth specific facts.  Applied Genetics, 912 F.2d at 1241.

The Court must view the record in a light most favorable to the parties opposing the motion for summary judgment.  Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991).  Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative.  Anderson, 477 U.S. at 250-51.  "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial."  Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.

2

**Factual Background**

The following material facts are uncontroverted, deemed admitted or, where disputed, viewed in the light most favorable to each plaintiff.

Defendant provides long term care to elderly patients, and at relevant all times, operated the Alzheimer's Center of Kansas City ("the Center"). The Center is divided into units, including the Strawberry Hill and Bethel units, with 30 to 40 residents per unit.

From March 15, 2000 through December 22, 2003, Donna Kopp was administrator of the Center. During 2003 and 2004, Cindy Frakes was Regional Manager for the region which included the Center. In late 2003, Kopp resigned and Frakes became interim administrator. From March of 2003 through January of 2004, Barbara McCormick was director of nursing. Some time in 2004, for approximately one month, Michaelene Criqui was interim director of nursing. At all relevant times, registered nurse Mary Baar was director of nursing at defendant's Post-Acute Center of Kansas City. In 2004, Baar assisted at the Center, working closely with and reporting to Frakes. From November of 2003 through February or March of 2004, registered nurse Larie Glynn was minimum data set coordinator. At various times, Shawn Garbin was also director of nursing at the Center. Garen Cox was defendant's general counsel.

In November of 2003, Frakes, Baar, Kopp, McCormick and Glynn met to address deficiencies which the State of Kansas had found in its annual survey of the Center. The meeting involved a discussion of employee performance, and Frakes and Baar instructed McCormick to terminate certain employees. Baar told McCormick that if she did not have a reason to terminate them, she should "piss in their Cheerios" by doing things like changing their schedules or issuing performance warnings until they decided to quit. The employees targeted for termination included plaintiffs Barbara Balfour, Barbara Gatson and

Rhonda Williams.  Defendant posted an open invitation to employees to "sign and resign" if they did not like the Center operation.

In the fall of 2003, defendant renovated the Center and installed new cabinets.  On December 8, 2003, a resident (J.M.) pulled over a cabinet and fractured his leg.  Defendant investigated the incident and self-reported it to the State.  Although J.M.'s medical records revealed that he had a documented propensity to pull and shake doors, the self-report stated that "neglect or abuse can be ruled out" and that J.M. had not been observed pulling on door handles or shaking doors before or after his readmission to the facility.

## I.   Barbara Balfour

From June 14, 2001 through January 16, 2004, Balfour was a practical nurse at the Center.  Twice during her employment (in July of 2002 and in 2003) the Center selected her as employee of the month.

On September 7, 2002, a resident injured Balfour by repeatedly striking her in the face, jaw and neck.  Balfour obtained an attorney and on October 24, 2002, initiated a workers' compensation action. She had bone grafting surgery in August of 2003, and required other treatment as recently as September of 2004.[1]  Balfour had previously filed one other workers' compensation claim, in 2002.  Frakes learned of Balfour's workers' compensation claims before defendant terminated Balfour's employment on January 16, 2004; the record is unclear, however, exactly when Frakes knew of the claims.  Shortly before defendant terminated Balfour's employment, Frakes told McCormick that Balfour was "physically injured

_____

[1]      Her workers' compensation claim was still pending at the time of her deposition in this matter.

4

more than any other employee" because she "was openly aggressive with the residents."[2]

In November of 2003, Balfour complained about inadequate staffing to McCormick, her immediate supervisor.  McCormick relayed Balfour's concerns about short staffing to Frakes and Baar.  Balfour also complained to Frakes about inadequate staffing on multiple occasions in the hallways.  Balfour complained to Frakes about inadequate staffing on the day that defendant terminated her employment.

In November or December of 2003, Frakes told Balfour that she smelled urine in the unit and instructed Balfour to "find that smell."  Balfour described her subsequent encounter with Frakes and Baar as follows:

> Well, [Frakes] grunted and went out the hallway, and then I found myself on my knees sniffing the carpet, and I remember a [certified nurse's aide] coming up to me and going, what are you doing, and I go, I don't know.  So I went up front and [Frakes] was standing outside Barbara McCormick's door. Barbara McCormick was sitting at her desk, and some woman was sitting at the chair beside her desk, and I went up to [Frakes].  I said, I don't know what to smell.  I don't know what you are smelling. What is the smell?  She told me that I needed to go back there and I needed to do fucking peri care or go wash it, better go back, wash those mother fucker's crotches, don't stop it until you find that smell, and I just looked at her, and the next thing I know I've got this woman who is sitting in the chair, she jumped up and she's right here in my face screaming at me telling me that, you know, we have -- you better fucking respect me. We don't -- you better fucking respect us.  We don't have to fucking respect you.  I don't give a shit about this fucking building, all those mother fuckers back there don't care.  And I just looked at her and I said, who are you?  And that's when she proceeded to tell me that she was Mary Barr and she was God in my world.

As noted above, J.M. pulled over a cabinet and fractured his leg on December 8, 2003.  Before the meeting between Frakes, Baar, Kopp, McCormick and Glynn in November of 2003, Balfour had told Kopp and Sandy O'Neal (defendant's interior designer), that the cabinets needed to be anchored to the

---

[2]        McCormick recorded this statement in a memorandum regarding certain employees, including Balfour.  In her deposition, McCormick described the memorandum, stating that "this record has employees listed that [Frakes and Baar] wanted to be gone from the facility and the reasons why."

wall or someone would get hurt.  Balfour also asked a maintenance worker to secure the cabinet to the

wall, but he refused to do so.  After the accident, Balfour reported her concerns to McCormick.[3]  Balfour's

affidavit indicates that she complained to McCormick to "blow[] the whistle on the fact that resident J.M.

was a victim of neglect in that the injury he suffered should have been prevented."  In January of 2004,

Frakes questioned O'Neal regarding Balfour's contention of neglect.  State surveyors would have been

concerned if Balfour had raised her complaints during their inspection of the Center, and when State

surveyors inspected the Center, Frakes and Baar told McCormick that they did not want Balfour present

and expressed concern that Balfour would tell the surveyors how J.M. was injured.  Frakes and Baar

instructed McCormick to move Balfour to the Strawberry Hill unit so that Frakes and Baar could watch

her while the State surveyors were inspecting the Center.[4]

Two or three weeks after Frakes expressed concern to McCormick about Balfour's allegations

---

[3]     McCormick's testimony regarding her conversation with Balfour after the accident was as follows:

A. She came into my office and stated that she had requested a cabinet be fixed to the wall, had asked the maintenance man to do so, and the maintenance man had been told by the interior decorator, "No, do not fasten the cabinet."
Q. Do you recall anything else that would have been said in that conversation you had with Miss Balfour?
A. No, she was very tearful, very upset.
Q. You mean Miss Balfour?
A. Yes.
Q. Did you have an understanding at the time as to why she was upset?
A. Yes.
Q. And what was your understanding at the time?
A. That a resident was injured.

[4]     Frakes claims that Balfour was moved because of her propensity to agitate dementia patients, thereby increasing her risk of physical injury.  Frakes believed that Balfour should not work with dementia patients because of this propensity of injury.

6

of neglect, Frakes instructed McCormick to write up Balfour so that defendant could terminate her employment.  On January 15, 2004, McCormick prepared, signed and presented to Frakes an Employee Disciplinary Record form which listed five reasons for disciplinary action against Balfour.[5]  McCormick testified that she listed the reasons because Frakes had instructed her to find reasons to terminate Balfour's employment.  McCormick testified that after she gave the form to Frakes, Frakes told her that the reasons were not good enough and kept the form.

On January 16, 2004, Frakes instructed McCormick to terminate Balfour's employment.  Before giving this instruction, Frakes told McCormick, "Wait a minute, I have to call corporate because of her workmans' comp case.  We can't terminate her if it's still in litigation or still open."[6]  After making the call, Frakes told McCormick, "It's all taken care of.  She has been paid.  Go ahead."[7]  Frakes also told McCormick, "I want that bitch gone in ten minutes."  Frakes instructed McCormick to prepare a termination form and dictated its contents, and McCormick terminated Balfour later that day.

The Employee Termination For Cause form indicates that defendant terminated Balfour for

---

[5]     The Employee Disciplinary Record states that Balfour (1) failed to complete new orders the day they were written; (2) told an employee who was injured on the job not to file proper incident report because "they won't do anything for you;" (3) failed to give proper unit orientation to a new employee by assigning her to pass medication on the first day; and (4) failed to complete physician's order for lab follow up.  The fifth reason is scratched-out and is illegible.

[6]     Under defendant's policy, supervisors may not discharge an employee who has a pending workers' compensation claim without first speaking with Cox (defendant's general counsel) or Carol Blackburn, the workers' compensation claims manager.

[7]     The record does not reveal who Frakes spoke with during this conversation.  The person with whom she spoke incorrectly informed her that Balfour's workers' compensation claim was settled.  As noted above, the workers' compensation claim which Balfour filed on October 24, 2002, was still pending at the time of her deposition in this matter.

"creating a hostile work environment – negative attitude."  See Exhibit H attached to Memorandum In

Support Of Motion For Partial Summary Judgment [Plaintiff Balfour] (Doc. #192) filed August 29, 2006.

McCormick signed the form in her capacity as administrator.  She did not agree with the termination,[8] and

she testified that Frakes forced her to do it.[9]  McCormick indicated to Balfour that defendant was tired of

her complaints about staffing issues and J.M.'s accident.

Balfour asserts various claims of wrongful discharge in violation of public policy under Kansas

common law.  Specifically, she argues that defendant wrongfully terminated her employment because she

(1) exercised her rights to workers' compensation; (2) blew the whistle on defendant's inadequate staffing;

and (3) blew the whistle on defendant's neglect of a resident.[10]

## II.   Patricia Clayborn

From July 17, 2003 through September of 2004, Clayborn worked as a practical nurse at the

Center.  In December of 2003 and January of 2004, Clayborn was responsible for scheduling employees

at the Center.  During this time, she was responsible for the number of employees on staff at a given time.

---

[8]   McCormick testified that "In the nine months that I worked in a supervisory capacity with [Balfour], I saw that she was well versed in the care of the dementia residents and that that care always came first."

[9]   McCormick also testified that she feared losing her job if she did not comply.

[10]   Originally, Balfour also asserted claims of wrongful discharge in violation of Kansas common law alleging that defendant (1) terminated her employment because she refused to perform the illegal act of remaining silent about resident neglect, and (2) terminated her employment with the intent of interfering with her attainment of rights under defendant's Employee Stock Ownership Plan ("ESOP") in violation of Section 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140. Balfour now admits all material facts and concedes that summary judgment for defendant is appropriate on these claims.  See Plaintiff's Brief in Opposition To Defendant's Motion For Summary Judgment (Doc. #203) filed October 9, 2006 at 1 n.1, 14 n.3.  Defendant is therefore entitled to summary judgment on these claims.

In January of 2004, Baar told Clayborn that she had been scheduling too many people and Baar assumed responsibility for scheduling. From that point, Clayborn periodically assisted with the schedule, but only within parameters set by Baar. These parameters cut staffing levels by more than one third.

In mid-2004, Clayborn told state surveyors that the Center had a problem with inadequate staffing. Clayborn also told state surveyors that employees from other facilities were being called to clock in at the Center to create the appearance that the Center was adequately staffed.[11] On October 21, 2004, Clayborn reported to a State agency that she was concerned that the reduction in staffing negatively affected the care of Center patients.

On August 12, 2004, Clayborn interviewed for employment with ANEW Home Health ("ANEW"). Prior to August 15, 2004, Clayborn gave a letter to Belinda Talbott, the Center's director of nursing, stating that she would be attending school beginning August 15, 2004, and could only work certain shifts, but still needed 40 hours per week. From August 15 through September 1, 2004, defendant continued to schedule Clayborn almost 40 hours per week. During the week of September 2, 2004, Clayborn worked 30.5 hours. On September 7, 2004, ANEW hired Clayborn to work as a PRN (as needed). That same month, Clayborn resigned her full-time position and began working for defendant on an as-needed basis.[12]

For approximately a year and a half, including August through October of 2004, Dr. Ahmed Baig

_____

[11]     This practice is sometimes referred to as "cross-clocking."

[12]     The reason for Clayborn's resignation from full-time employment is not clear. Her response to defendant's first set of interrogatories indicates that she resigned from full-time employment due to a hostile work environment. Clayborn later testified, however, that she resigned so that she could go back to school.

was medical director for the Center.  L.P., a patient at the Center, had a history of harassing and sexual acts, and often touched and grabbed residents and staff.  On an unknown date, Baar spoke with Baig about prescribing saltpeter for L.P.[13]  On August 31, 2004, defendant received an order for saltpeter which nurses began administering to L.P.  The order listed Baig as the attending physician.  On an unknown date, Clayborn consulted Baig about L.P.'s saltpeter prescription and Baig told Clayborn that he had not ordered such a prescription.  Between September 7 and September 26, 2004,[14] Clayborn withheld the administration of L.P.'s medication.  Following typical protocol, Clayborn noted this action in L.P.'s medical records under "Nurse's Medication Notes" with the entry "held d/t fms (DPOAs) request."[15] Clayborn testified, however, that she withheld L.P.'s saltpeter because she knew the prescription was invalid.  On September 5, 2004, Baig verbally ordered a hold on the saltpeter prescription; on September 9, 2004, he signed an order to this effect.  On September 20, 2004, defendant discontinued the administration of saltpeter.[16]

Saltpeter contains potassium, which can be harmful to the heart in levels that are either too high or too low.  While L.P. was receiving saltpeter, Clayborn witnessed severe deterioration of his health.

---

[13]    Saltpeter is prescribed to curb an individual's sexual desires and prevent that individual from harming another person through inappropriate sexual acts.

[14]    The date of Clayborn's entry is illegible.  The entries, however, run in chronological order, placing Clayborn's entry between September 7 and September 26, 2004.

[15]    Defendant explains that this entry means "held due to family's (durable power of attorney's) request."

[16]    On October 27, 2004, Baig signed the verbal order of August 31, 2004, which authorized the saltpeter.  Typically, Baig would authorize an order by telephone and sign the order on a later day.  The Kansas Administrative Regulations provide that all verbal orders by a physician must be counter-signed within seven working days after receipt of the verbal order. Kan. Admin. Regs. § 28-39-156(b)(4).

10

Clayborn never spoke with Frakes or Baar regarding the administration of saltpeter to L.P., but on October 21, 2004, she telephoned the Kansas Department of Aging to report her concerns. The Department investigated the allegations and found that they were unsubstantiated.

On September 5, 2004, Clayborn took a call from Frakes at one of the nursing stations. Frakes was angry that a nurse's aide had been sent home. During this conversation, Clayborn told Frakes, "I'm not going to sit here and listen to you yell at me." Frakes attempted to hang up her phone, but left the phone off of the hook. After Clayborn hung up her phone, it rang back. When she picked it up, Clayborn could hear Frakes speaking to another person. During this conversation, Frakes said, "I'm sick of arguing with that worthless fucking bitch." Clayborn was upset; she called Frakes back on another line and told Frakes that the phone was off the hook and that she had heard everything Frakes said about her. Frakes responded, "I'm sorry. I should not have said that." Clayborn then told Frakes that she had "watched [Frakes] walk all over employees and treat them like shit for months," and that "[Frakes] was not going to treat [Clayborn] the way she treated [other employees]." During this conversation, Clayborn also raised concerns to Frakes about adult briefs[17] and staffing issues, including her concern that the Center was short staffed and that staff from other facilities were being brought in to inflate the Center's staffing figures.[18]

---

[17]     As interim director of nursing, Criqui had attempted to implement a program of providing adult incontinency briefs, which Baar opposed. The program was instituted on an individualized basis, and required the nursing staff to make case by case determinations on the use of adult briefs. During this time, the Center also developed and implemented a toileting program designed to encourage resident continence.

[18]     This evidence is taken from Clayborn's affidavit. See Exhibit F attached to Plaintiff's Brief In Opposition To Defendant's Partial Motion For Summary Judgment Against Patty Clayborn (Doc. #205) filed October 9, 2006. Defendant generally objects to the affidavit as conclusory and without foundation. The Court finds, however, that the substance of the affidavit is within Clayborn's personal knowledge. Further, the affidavit is factually specific and is therefore legally competent to challenge the motion for

(continued...)

Clayborn used the term "lesbian" during this conversation to describe how other people referred to Frakes.[19]

During their conversation on September 5, 2004, Clayborn indicated to Frakes that she would contact Cox, defendant's general counsel, about Frakes. Frakes asked Clayborn not to do so. On September 7, 2004, Clayborn called Cox, discussed the phone call with Frakes on September 5, and reported her concerns about staffing and the discontinued use of adult briefs.

Some time after September 5, 2004, Baar instructed Criqui to remove Clayborn from the schedule. After this instruction, Criqui told Clayborn that Barr directed that she not be scheduled because she was a drug user and an alcoholic.[20] Criqui later scheduled Clayborn on at least two different occasions. When Frakes learned that Criqui was still scheduling Clayborn, Frakes told Criqui to completely stop using Clayborn.[21] During the week of September 9, 2004, Clayborn worked 24.7 hours. During the week of September 16, 2004, Clayborn worked 6.6 hours. During the week of September 23, 2004, Clayborn

---

[18](...continued)
summary judgment. See Williams v. Shields, 77 Fed. Appx. 501, 503 (10th Cir. 2003). The Court will consider the affidavit.

[19]     Lillian Randolph, who was with Clayborn during her conversation with Frakes, testified that Clayborn made a comment directed at Frakes' sexual orientation. According to Criqui, Clayborn later admitted that she had made a derogatory statement about Frakes' sexual orientation.

[20]     Criqui testified that Baar told her that Clayborn was a drug user and an alcoholic, but that this was not related to Baar's demand that she remove Clayborn from the schedule. For purposes of the motion, however, the Court views the evidence in the light most favorable to Clayborn and accepts her version of the conversation with Criqui. According to Clayborn, Criqui told her that she would not be scheduled because she was an alcoholic and a drug user.

[21]     Frakes admits that she was the decisionmaker with respect to these actions against Clayborn.

12

worked 1.9 hours.  Clayborn did not work at all after September 25, 2004.  Defendant admits it completely removed Clayborn from the schedule because of her conversation with Frakes on September 5, 2004.

Defendant uses a "Compudata" computer system to access and enter patient medical information, physician orders, medication sheets, nursing notes and other information relating to clinical care.  After Clayborn began working on an as-needed basis, Baar observed that medications and orders were being altered in the Compudata system.  From the user log, Baar determined that Clayborn or Ann Bolton, another nurse, had made the changes.  The changes prevented Baar from implementing the system she desired, and she reported her concerns to Frakes.  Defendant never disciplined or counseled Clayborn for changing information in the Compudata system.  By early October, however, defendant denied all charge nurses access to the Compudata system.

On October 5, 2004, Baar sent Frakes an email with the subject line "patty clayborn."  It stated as follows:

> Talked with [Criqui] and she told me that she has used [Clayborn] 2 times after the 13th.  I talked with [Criqui] and Kim and told them that "I didn't think [Frakes] wanted her back in the facility, she would rather use agency (told that to Kim not [Criqui]) there were more than 2 days in the computda [sic] system.  I think they have the warm body mentality.  I told Kim, [Criqui] didn't ask me if we had any staff to work.  It is my recommendation that she not work.  After reviewing her medication practices on compudata, I strongly recommend this.  I talked with Jay today and he has taken all the charge nurses out of compudata.

Exhibit J attached to Memorandum In Support Of Motion For Partial Summary Judgment [Plaintiff Clayborn] (Doc. #196) filed August 29, 2006.[22]

_____

[22]     The record does not reveal who Kim and Jay are.  They do not appear to be material
(continued...)

13

Clayborn asserts various claims of wrongful discharge in violation of public policy under Kansas common law. Specifically, she argues that defendant wrongfully terminated her employment because she (1) blew the whistle on defendant's inadequate staffing; (2) blew the whistle on defendant's illegal staffing; (3) blew the whistle on defendant's failure to provide adult diapers; and (4) refused to administer medication which she believed had been illegally prescribed.

**III.    Barbara Gatson**

From November 25, 1997 through December 8, 2003, Gatson, an African-American female, worked as a practical nurse at the Center. Before working at the Center, Gatson worked at defendant's Post-Acute Center, where Baar was director of nursing. Gatson quit that job after an argument with Baar. Baar told Gatson that she would be fired if she did not confirm that a nurse's aide had hit a resident with a brush. Gatson did not witness this incident, could not confirm it and chose to quit rather than be fired. At the meeting between Frakes, Baar, Kopp, McCormick and Glynn in November of 2003, Baar spoke about incidents involving Gatson while Gatson worked at the Post-Acute Center. The record contains no evidence that Baar specifically spoke about her argument with Gatson, but Baar stated that "[Gatson] should have never been hired [at the Center]."

During Gatson's employment, Frakes referred to Gatson as a "nigger" and African-Americans in general as "stupid niggers," and referred to one individual who had married an African-American as a "nigger lover." Baar once told McCormick that she had too many "Africans" working at the Center.

With regard to staffing, Gatson had discussions with McCormick and Heather Lange about staff

---

[22](...continued)
parties for purposes of this motion.

14

shortages at the Center.  Specifically, Gatson complained to McCormick on more than one occasion that she could not work effectively when defendant scheduled only three aides and one nurse.  During one of her conversations with McCormick, Gatson stated "we don't have enough help." On one occasion, Frakes asked Gatson, "do you all have enough help in this building," to which Gatson replied, "no."  Gatson never reported her staffing concerns to defendant's home office or the State.  Gatson heard Frakes and Baar comment that the Center was over-staffed.  Gatson felt that the Center was under-staffed and that residents were not receiving adequate care, but she admits that she did not know what ratio of staff to residents the law required.[23]  In fact, Gatson had no knowledge of any violation with regard to staff-resident ratios, and never attempted to determine the ratio of staff to residents at the Center.

In early December of 2003, Glynn approached a group of nurses, including Gatson, and asked why none of them were doing activities with residents.  Gatson responded, "I didn't know we had to do activities.  Where is [sic] the activity people?"  Glynn then informed Gatson of a new rule that nursing staff was required to perform activities with residents on evenings and weekends because activity staff was not present at those times.  Previously defendant had not required nursing staff to perform such activities.  Gatson told Glynn "I don't understand why we have to do it," and walked away.  Gatson then proceeded to perform activities with the residents as instructed.

On December 6, 2003, Sandy McMillian overheard one nurse say to another nurse, "yes, sir, master."  McMillian assumed that Gatson had made this comment and reported it to management.  McMillian had incorrectly identified Gatson as the person who made the comment.  Gatson did not make

---

[23]     Gatson testified that such a ratio is "just a number" that "makes no sense in reality."

the comment, but she was present when another African-American nurse made the comment to a Caucasian nurse who had asked her to pick up lunch.

As noted above, J.M. pulled over a cabinet and fractured his leg on December 8, 2003. Before the accident, Gatson had expressed concerns about the safety of the cabinet.[24]  After the accident she "blew the whistle on the fact that the injury occurred as a result of negligence when [she] stated that the incident was totally avoidable."[25]  At the time of the accident, Kopp and McCormick were involved in a meeting and could not check on J.M.  Gatson was the charge nurse at the time of the accident.  Defendant did not interview Gatson during its investigation of the accident, and its self-report to the State did not include a statement from Gatson.  Its failure to include a statement from Gatson contravened its policy and practice because Gatson was on duty at the time of the accident.

Gatson denies that she had a "bad or negative tone" during her conversation with Glynn about activities with residents.  On December 8, 2004, however, Glynn completed a "Report of Concern" regarding their conversation.  The report stated as follows:

> Instructed staff that activities needed to be completed by nursing staff on weekends/evenings since there aren't activity personal [sic] available. Told by Barb Gatson LPN that she didn't do activities – that it was the responsibility of activities [and] they should be there.  Re-instructed staff that it was to be nursing's responsibility now.  She then walked away from this writer [without] response.

Exhibit B to Affidavit of Donna Kopp, attached as Exhibit B to Memorandum In Support Of Motion For Partial Summary Judgment [Plaintiff Barbara Gatson] (Doc. #189) filed August 29, 2006.

---

[24]     The record contains no evidence how or when Gatson expressed her concerns.

[25]     Gatson argues that she "blew the whistle" to Shawn Garbin, but the record contains no evidence of who she spoke with after J.M.'s accident.

16

That same day, December 8, 2004, Gatson met with Kopp, McCormick and McMillian.  At the meeting, Kopp told Gatson that defendant was terminating her employment, and gave her a form entitled "Employee Termination For Cause."  The form provided as follows:

> I, Donna Kopp, have hereby provided notice to Barbara Gatson that on this 8th day of December, 2003, said employee is being discharged from employment for misconduct connected with their work.  Misconduct is a violation of a duty or obligation owed Medicalodges as a condition of employment.  Specifically, such items causing this discharge are as follows:
> (1) Insubordination – refused to carry out direct instruction from supervisor
> (2) Creating a hostile work environment for other employees.
> I hereby affirm that said employee has been duly warned of their actions and has failed to correct such deficiency.  Further, I state that said employee has been fully advised of the contents of this document and is fully knowledgeable of its contents and purpose.

Exhibit A to Affidavit of Donna Kopp, attached as Exhibit B to Memorandum In Support Of Motion For Partial Summary Judgment [Plaintiff Barbara Gatson].  The insubordination charge was based on Glynn's report of her conversation with Gatson about activities with residents.  When she received the report, Gatson protested that allegation.  The hostile work environment charge was based on McMillian's report that Gatson had made the "yes, sir, master" comment.  When Gatson objected that she had not made this comment, Kopp drew a line through that charge with the notation "error DK." Gatson signed the employee termination form with the notation "I disagree with this."  Kopp testified that she terminated Gatson because of the insubordination charge.  At the meeting on December 8, 2003, Kopp told Gatson that she did not believe the insubordination charge, but she nevertheless terminated Gatson's employment.

After her termination, defendant told the Unemployment Commission that Gatson was terminated because she did not carry out duties requested by her supervisor.  Defendant labeled Gatson a

"troublemaker," and deemed that she should not be rehired.[26]

Gatson asserts that defendant terminated her employment on the basis of race in violation of 42 U.S.C. § 1981. Gatson also asserts various claims of wrongful discharge in violation of public policy under Kansas common law. Specifically, she argues that defendant wrongfully terminated her employment because she (1) blew the whistle on inadequate staffing and (2) blew the whistle on resident neglect.[27]

**IV.   Rhonda Williams**

From May 8, 2001 through January 14, 2004, Williams, an African-American female, worked as a Certified Medication Aide at the Center. In 2002, Williams wrote a letter to the Kansas Department of Health and Human Resources, complaining that the Center had exposed her to methicillin resistant staphylococcus aureus ("MRSA") without informing her. Specifically, Williams alleged that she came into direct contact with a patient with MRSA and was not informed of the patient's condition. Williams was never diagnosed with MRSA, and she did not tell anyone at the Center that she had contacted the State regarding her exposure. She made a similar complaint of exposure to MRSA, however, to nursing director Heather Lange.

The record contains no evidence that aside from her letter in 2002, Williams made other written complaints to the State. In 2003, after defendant sent to the hospital a patient suspected of having MRSA,

---

[26]     Defendant admits that Gatson was labeled a "troublemaker," but the record contains no evidence who specifically made this comment.

[27]     Originally, Gatson also asserted a claim of wrongful discharge in violation of Kansas common law alleging that defendant terminated her employment because she refused to perform the illegal act of remaining silent about resident neglect. Gatson now admits all material facts and concedes that summary judgment for defendant is appropriate on this claim. See Plaintiff's Brief in Opposition To Defendant's Motion For Summary Judgment Against Plaintiff Barbara Gatson (Doc. #204) filed October 9, 2006 at 1 n.1. Defendant is therefore entitled to summary judgment on this claim.

Williams told McCormick that she was concerned that defendant had allowed her to go into a room with a patient infected with MRSA.

Some time in 2003, Williams drafted a witness statement regarding a patient's elopement. Kopp asked Williams to change her statement with regard to the amount of time the patient was away without authorization. Williams refused to change her statement.

In December of 2003, Williams witnessed an incident in which a nurse aide ran over a resident's foot with a wheelchair. Williams completed an incident report and slipped it under McCormick's door. Williams later saw an employee place the ripped-up report in a trash can. Williams complained to McCormick. McCormick told her that it was Garbin's responsibility – not her responsibility – to handle such reports. The resident's medical records do not reflect a foot injury caused by a wheelchair. Williams testified that the incident report was thrown away to prevent it from being recorded in the resident's medical records. Defendant's policy is to destroy incident reports after they are logged into the computer system. Williams did not report to any state agency or to defendant's home office that her incident report had been trashed.

In December of 2003, after an African-American nurse's aide called in sick, Frakes told Williams that "they didn't need anymore help," that "those people are basically lazy" and that "we don't get enough white applicants." Because Williams' husband is African-American, she asked Frakes if she was implying that African-Americans are lazy. Frakes responded, "oh, you're the one married to the black man." Williams does not claim that any other manager made race-based statements to her.

As noted above, J.M. pulled over a cabinet and fractured his leg on December 8, 2003. Before the accident, Williams wrote Kopp a note which expressed her concern that the cabinet was not securely

fastened to the wall and that it might fall on J.M., who was known to shake the cabinets.  Kopp told

Williams that she would immediately resolve the problem.

The record contains no evidence that Williams ever wrote a report regarding suspected patient

abuse at the Center.

In January of 2004, in the presence of other staff, Frakes used a hydrogener to test whether

Williams' pants were wet.[28]  On January 9, 2004, McCormick suspended Williams for three days because

she did not perform a narcotic count and misplaced the keys to the narcotics cart.  Williams testified that

she properly signed off on the narcotics count at the end of her shift and gave the keys to the narcotics cart

to Carol Sestrich, an incoming nurse, in a hand-to-hand exchange.  Williams asked McCormick to see the

narcotics book, which could verify that she performed the narcotics count.  McCormick refused to let her

see it and told Williams that if she did not like the write-up, she could resign.  After the suspension,

McCormick told the nursing staff that if the keys to the narcotics cart came up missing again, McCormick

would "attach it" to their licenses.  Almost all nurses (including Williams) were present at this meeting and

McCormick directed her statements to everyone present.

On January 14, 2004, Williams resigned her employment.  Her resignation letter stated as follows:

I have decided to end my employment with Alzheimer's Center of KC effective immediately.
Due to someone stealing items from the facility.
First, someone took the Cell Phone from the med. room which you needed a key to do.
Someone stole money from a purses in the med room several times.
Now someone took the Narcotics key during the night.  The narcotics count was correct
nothing missing.  Me [and] the LPN counted on 3-11 shift.
I had told the [director of nursing] I saw the narcotic keys and the Red keys on the desk
between the 2 nurses before I left.  But I had given the keys to the LPN coming on duty she

---

[28]    A hydrogener is a device which indicates whether planting soil is sufficiently wet.

put her purse [and] coat in the med. room.

She also had given a narcotic that night but she wrote 1-7-04 on the narc sheet and it had changed over to the 8th at midnight. I know for a fact he had no narc. signed out for the 7th when I counted on 3-11 shift. (his narc is scheduled 6 AM so he got double <u>dosed</u>)

I was suspended for 3 day behind her loosing [sic] the keys. And written up saying I put the keys on desk [and] that's not what I said. I said I saw keys on desk.

I will not be held responsible for other people loosing [sic] things like narc. keys. I also no [sic] the med cart was locked so you needed a key to unlock it.

It seems it is not very important that the Res. don't get their narcotic meds. I have come in before and no nurse was on duty when I counted by myself I had to take 2 cards of narcs to the Quality Assurance RN for her to sign the narc. book because they had narcs missing [and] not signed out for no one was suspended or even written up. One res. had 3 more narcs than he should have had when I counted after being off for 2 days. No one got written up or suspended for not giving his med. to him. It was ritalin. I could go on [and] on but my point is narc. count was correct but keys were lost. I don't know what the Nurse coming on said but she can't even keep up with her own stuff that night she came to desk saying someone took her cart later said she found it somewhere else. She is very forgetfull [sic]. I also know the LPN on my shift saw me give her the key she was sitting right there and they were talking. Carol said she wanted to lock up the cart [and] stuff in Med. room. I gave her the keys and went on with what I was doing. Why she did or did not say I gave the keys to Carol I don't know. But she is as bad as Carol. She is forgetfull [sic] too I help remind her about things all the time. I was busy, they were busy I forgot to count before I left.

Exhibit I attached to <u>Memorandum In Support Of Defendant's Motion For Partial Summary Judgment</u> <u>[Plaintiff Williams]</u> (Doc. #194). Williams testified that she resigned because she was accused of something that she did not do. As factors in her decision, she also identified harassment, improper treatment of patients and cussing by Garbin.[29] No one asked her to resign.

Service Employees International Union Local 96 ("the Union") entered into a collective bargaining agreement with defendant on behalf of all employees. Based on a telephone conversation with a Union

---

[29]    Williams heard about other employees being cussed at in shower rooms, but no cussing was ever directed at her. Garbin told Williams that he would knock all the supplies off the shelves of the supply room and make her pick them up because he believed that she had left the door to the supply room open. Garbin also told Williams that he held her job in the palm of his hand.

representative, Williams believed that the Union would not stand up to help her fight defendant.  The

National Labor Relations Board ("NLRB") later found that the Union had failed in its duty to represent

Williams and other employees, and Williams learned that the Union was obligated to represent her.[30]

Williams would not have resigned from her employment if the Union had been available to represent her.

After Williams resigned, an unknown employee of defendant expressed in writing that she should

not be rehired because she was a "troublemaker."

Williams asserts that in violation of 42 U.S.C. § 1981, defendant constructively terminated her

employment based on race and retaliated by constructively terminating her employment because she

opposed race discrimination.  Williams also asserts various claims of constructive discharge in violation of

public policy under Kansas common law.  Specifically, she argues that defendant constructively terminated

her employment because she (1) blew the whistle on failure to isolate infectious residents or warn staff of

such infections; (2) blew the whistle on illegal destruction of documents and concealment of a resident's

injury; (3) refused to falsely report the circumstances surrounding a resident's elopement; (4) refused to

keep quiet about resident neglect; and (5) refused to provide false information to State investigators

regarding a resident's injury.[31]

---

[30]        The NLRB made numerous findings of unfair and unethical working conditions at the
Center, including a rule which prohibited employees from talking about the terms and conditions of their
employment and invited employees to quit if they did not abide by the rule.

[31]        Originally, Williams also asserted a claim that defendant terminated her employment with
the intent of interfering with her attainment of rights under defendant's ESOP in violation of Section 510
of ERISA, 29 U.S.C. § 1140.  Williams now admits all material facts and concedes that summary judgment
for defendant is appropriate on this claim.  See Plaintiff's Brief in Opposition To Defendant's Motion For
Summary Judgment Against Plaintiff Rhonda Williams (Doc. #206) filed October 9, 2006 at 1 n.1.
Defendant is therefore entitled to summary judgment on this claim.

<u>Analysis</u>

**I.      Barbara Balfour's Claims**

Balfour asserts three claims of wrongful discharge in violation of public policy under Kansas common law.  Specifically, she argues that defendant wrongfully terminated her employment because she (1) exercised her rights to workers' compensation; (2) blew the whistle on defendant's inadequate staffing; and (3) blew the whistle on resident neglect.

Kansas subscribes to the doctrine of employment at will.  Absent an express or implied contract of fixed duration, or where recognized public policy concerns are raised, employment is terminable at the will of either party.  <u>Frye v. IBP, Inc.</u>, 15 F. Supp.2d 1032, 1046 (D. Kan. 1998).  To date, Kansas has recognized three public policy exceptions to its employment-at-will doctrine: an employee may not be discharged for (1) having filed a workers' compensation claim, <u>see</u> <u>Murphy v. City of Topeka</u>, 6 Kan. App.2d 488, 495-97, 630 P.2d 186, 192-93 (1981); (2) whistleblowing, <u>see</u> <u>Palmer v. Brown</u>, 242 Kan. 893, 900, 752 P.2d 685, 689-90 (1988); or (3) exercising rights under the Federal Employers Liability Act, <u>see</u> <u>Hysten v. Burlington N. Santa Fe Ry. Co.</u>, 277 Kan. 551, 563-64, 85 P.3d 1183, 1191 (2004), <u>as modified</u>, No. 90,730, 2004 WL 3142558 (June 1, 2004).  These exceptions are narrow and apply only to circumstances in which the contested discharge seriously contravenes public policy.  <u>Aiken v. Bus. & Indus. Health Group, Inc.</u>, 886 F. Supp. 1565, 1573 (D. Kan. 1995).

Wrongful discharge claims under Kansas law are analyzed using the three-part framework established in <u>McDonell Douglas v. Green</u>, 411 U.S. 792, 824 (1973).  <u>See</u> <u>Foster v. AlliedSignal, Inc.</u>, 293 F.3d 1187, 1193 (10th Cir. 2002).  Under this framework, plaintiff has the initial burden of establishing a prima facie case which raises a rebuttable presumption of retaliatory intent.  <u>Id.</u>  Once plaintiff establishes

23

a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory justification

for the discharge.  Bausman v. Interstate Brands Corp., 252 F.3d 1111, 1116 (10th Cir. 2001).  Finally,

if defendant meets this burden, the burden shifts back the plaintiff to "assert specific facts establishing a

triable issue as to whether the employer's reason for discharge is a mere cover-up or pretext for retaliatory

discharge."  Foster, 293 F.3d at 1194 (quoting Braken v. Dixon Indus., Inc., 272 Kan. 1272, 1276,

38 P.3d 679, 682 (2002)).[32]

### A.    Workers' Compensation Retaliation

As noted, Balfour claims that defendant terminated her employment on January 16, 2004, in

violation of Kansas public policy and common law, because she filed a workers' compensation claim.

---

[32]    The parties dispute the evidentiary standard to be applied to wrongful discharge claims under Kansas common law.  Defendant argues that the Court should apply a clear and convincing evidence standard, while plaintiffs argue that the Court should apply a preponderance of the evidence standard.  Under Kansas law, a retaliatory discharge claim must be established "by a preponderance of the evidence, but the evidence must be clear and convincing in nature."  Ortega v. IBP, Inc., 255 Kan. 513, 528, 874 P.2d 1188, 1198 (1994).  The Kansas Supreme Court has ultimately concluded that plaintiff "need not meet the clear and convincing standard at the summary judgment stage of the proceedings."  Rebarchek v. Farmers Coop. Elevator, 272 Kan. 546, 552, 35 P.3d 892, 898 (2001).  Because a federal court evaluating state claims is guided by federal standards governing summary judgment procedure, the evidentiary standard which Kansas courts apply on summary judgment are not germane.  See Foster, 293 F.3d at 1194-95.  In contrast to the rule espoused by the Kansas Supreme Court, "a plaintiff in federal court who opposes a summary judgment in a retaliatory discharge case based on Kansas law must set forth evidence of a clear and convincing nature that, if believed by the ultimate fact finder, would establish that plaintiff was more likely than not the victim of illegal retaliation by her employer."  Id. at 1195.  Plaintiff is not required, however, to establish the elements of his or her prima facie case by clear and convincing evidence.  Id. at 1193 n.3 (holding plaintiff to such standard at prima facie stage would pervert logic of McDonnell Douglas burden-shifting scheme adopted by Kansas courts; claimant's prima facie case not onerous burden).  The clear and convincing evidence standard applies once the burden shifts back to plaintiff to demonstrate that the employer's proffered reasons for termination are pretextual.  Id. at 1193 (if employer offers legitimate, nondiscriminatory reason for termination, burden shifts to plaintiff to show clear and convincing evidence of retaliation).

Kansas recognizes a claim of wrongful discharge in retaliation for filing a workers' compensation claim, see Murphy, 6 Kan. App.2d at 495-97, 630 P.2d at 192-93, and applies the McDonnell-Douglas burden-shifting framework to such claim, see Foster, 293 F.3d at 1193.  To establish a prima facie case of retaliation for filing a workers' compensation claim, plaintiff must show that (1) she filed a claim for workers' compensation benefits or sustained an injury for which she might assert a future claim for such benefits; (2) the employer had knowledge of her workers' compensation claim injury; (3) the employer terminated her employment; and (4) a causal connection existed between the protected activity or injury and the termination.  White v. Tomasic, 31 Kan. App.2d 597, 601-02, 69 P.3d 208, 211-12 (2003) (citing Rebarchek, 272 Kan. at 554, 35 P.3d at 899).

Defendant challenges the fourth element of Balfour's prima facie case – a causal connection between her protected activity or injury and her employment termination.  Specifically, defendant argues that (1) Balfour's termination on January 16, 2004, was not closely related in time to the filing of her workers' compensation claim on October 24, 2002; and (2) Balfour lacks additional evidence which might establish the necessary causal connection.  Balfour concedes that her claim lacks temporal proximity, but argues that other evidence is sufficient to establish the causal connection.[33]  The record reveals that

---

[33]      Balfour filed two workers' compensation claims in 2002, the second in October of that year.  Because she was terminated in January of 2004, approximately 15 months after filing her last workers' compensation claim, Balfour is correct that temporal proximity between the filing of her workers' compensation claims and her termination is lacking.  See Sutherland v. Goodyear Tire & Rubber Co., 446 F. Supp.2d 1203, 1213 (D. Kan. 2006) (citing Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997)) (three-month period between protected activity and termination, standing alone, does not establish causal connection).

Balfour's concession of temporal proximity may have been premature.  Temporal proximity may
(continued...)

(1) Frakes claimed that Balfour was physically injured more than any other employee; (2) Frakes targeted Balfour for termination in November of 2003, while she had a pending workers' compensation claim; (3) on January 16, 2004, immediately after she learned (incorrectly) that Balfour had settled her workers' compensation claim Frakes said "I want that bitch gone in ten minutes" and instructed McCormick to terminate her employment. Such evidence creates a genuine issue of material fact regarding causation. To establish the requisite causal connection, Balfour must "prove an unlawful intent on the part of the employer to terminate her because she had filed a workers' compensation claim or had sustained a work-related injury for which she might file such a claim." Bones v. Honeywell Int'l, Inc., 366 F.3d 869, 876 (10th Cir. 2004).

Because Balfour has established a genuine issue of material fact with regard to her prima facie case, the Court considers defendant's stated reason for termination. As its legitimate, non-retaliatory reason, defendant cites the Employee Termination For Cause form, which states that Balfour was terminated for "creating a hostile work environment – negative attitude." Balfour does not contest that this could constitute a legitimate, non-retaliatory reason for termination, but argues that the proffered reason is pretextual. The relevant issue is not whether the stated reasons were wise, fair or correct but whether defendant honestly believed in those reasons and acted in good faith. Stover v. Martinez, 382 F.3d 1064, 1076 (10th Cir.

---

[33](...continued)

be established based on the date of settlement of a workers' compensation claim. See Mondaine v. Am. Drug Stores, Inc., 408 F. Supp.2d 1169, 1194 (D. Kan. 2006). While the record indicates that Balfour had not settled her workers' compensation claim before her termination on January 16, 2004, Frakes instructed McCormick to terminate Balfour immediately after she learned that Balfour had settled her workers' compensation claim. Evidence of temporal proximity between Frakes' mistaken belief that Balfour had settled her workers' compensation claim, and Balfour's termination, might be sufficient to create a genuine issue of causation.

2004).  In examining this issue, a court must "look at the facts as they appear to the person making the decision to terminate plaintiff."  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1231.  The Court's role is not to second guess an employer's business judgment.  Stover, 382 F.3d at 1076.

A plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence."  Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).  While "[t]his burden is not onerous . . . it is also not empty or perfunctory."[34]  Id. at 1323-24.  A plaintiff typically makes a showing of pretext in one of three ways: (1) evidence that defendant's stated reason for the adverse employment action was false, i.e. unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting plaintiff.  Kendrick, 220 F.3d at 1230.  More specifically, evidence of pretext may include "prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating . . . criteria); and the use of subjective criteria."  Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1328 (10th Cir.), cert. denied, 528 U.S. 815 (1999).

Here, the record contains evidence that Frakes targeted Balfour for termination as early as

---

[34]     As noted above, however, in a wrongful discharge claim under Kansas common law, plaintiff must produce clear and convincing evidence of pretext that would allow the jury to find by a preponderance of the evidence that defendant illegally retaliated against her.  See Foster, 293 F.3d at 1195.

November of 2003, while she had a pending workers' compensation claim; that Baar instructed McCormick that if she did not have a legitimate reason for terminating Balfour's employment, she should "piss in [her] Cheerios" until Balfour quit; that Frakes believed that Balfour was the Center's most-injured nurse; that Balfour's immediate supervisor (McCormick) disagreed with the termination; and that Frakes instructed McCormick to terminate Balfour's employment as soon as she learned that Balfour had settled her workers' compensation claim.  From this evidence, a reasonably jury could easily find that defendant's proffered reason for termination – "creating a hostile work environment - negative attitude" – is unworthy of belief.  See Stover, 382 F.3d at 1076 (defendant must honestly believe stated reason and act in good faith on such reason); EEOC v. Town & Country Toyota, Inc., 7 Fed. Appx. 226, 2001 WL 369675, at *4 (4th Cir. Apr. 13, 2001) (contradiction between proffered explanation and supervisor's statements convincing evidence of pretext).  Because Balfour has cited clear and convincing evidence which reveals a genuine issue of material fact as to pretext, defendant is not entitled to summary judgment on Balfour's claim of wrongful discharge in retaliation for filing workers' compensation claims.

### B.      Whistleblowing Retaliation

Balfour claims that defendant terminated her employment on January 16, 2004, in violation of Kansas public policy and common law, because she reported (1) inadequate staffing; and (2) neglect of J.M.  As noted above, Kansas recognizes a claim for wrongful discharge in retaliation for whistle-blowing, see Palmer, 242 Kan. at 900, 752 P.2d at 689-90, and applies the McDonnell Douglas burden-shifting framework to such claim, see Foster, 293 F.3d at 1193.  Under Kansas law, plaintiff establishes a prima facie case of retaliation by showing that (1) a reasonably prudent person would have concluded that plaintiff's co-worker or employer was violating rules, regulations or the law pertaining to public health,

safety and general welfare; (2) the whistleblowing was done in good faith based on a concern regarding

that wrongful activity, rather than a corrupt motive like malice, spite, jealousy or personal gain; (3) the

employer knew of the employee's report before it discharged the employee; and (4) defendant discharged

the employee in retaliation for making the report.  Goodman v. Wesley Med. Ctr., L.L.C., 276 Kan. 586,

589-90, 78 P.3d 817, 821 (2003) (citing Palmer, 242 Kan. at 900, 752 P.2d at 689-90).

Defendant challenges the first and second prima facie elements of both whistleblower claims.  With

regard to the first element – whether a reasonably prudent person would have concluded that defendant

was violating rules, regulations or the law pertaining to public health, safety and general welfare – defendant

argues that (1) Balfour cannot identify specific rules, regulations or laws which it allegedly violated, and

(2) a reasonable person could not conclude that it violated any such rules, regulations or laws.  With regard

to the second element – whether Balfour's whistleblowing was done in good faith – defendant argues that

Balfour did not report her claims to company management or law enforcement officials.

### i.      Inadequate Staffing

Balfour's claim of whistleblowing on account of inadequate staffing is predicated on

Section 28-39-154 of the Kansas Administrative Regulations.  That section provides in pertinent part as

follows:

> Each nursing facility shall have sufficient nursing staff to provide nursing and related services
> to attain or maintain the highest practicable physical, mental, and psychosocial well-being of
> each resident as determined by resident assessments and individual plans of care.  The facility
> shall employ sufficient numbers of each of the following types of personnel to provide nursing
> care to all residents in accordance with each resident's comprehensive assessment and care
> plan.  ***
>
> (4) At least two nursing personnel shall be on duty at all times in the facility.  ***

29

(7) The nursing facility shall ensure that direct care staff are available to provide resident care in accordance with the following minimum requirements. ***

(B) The ratio of nursing personnel to residents per nursing unit shall not be fewer than one nursing staff member for each 30 residents or for each fraction of that number of residents.

Kan. Admin. Regs. § 28-39-154.  For the purposes of this regulation, "nursing personnel" are registered professional nurses, licensed practical nurses, licensed mental health technicians in nursing facilities for mental health, medication aides, nurse aides and nurse aide trainees.  Kan. Admin. Regs. § 28-39-144(oo).

Defendant argues that this regulation is not specific enough to form the basis of a whistleblower claim.  This position is without merit.  The regulation sets a baseline staffing requirement, and violations of the regulation can be identified through mathematical calculation.  Defendant is correct, however, that a reasonable person could not conclude that it had violated the regulation.  Balfour generally complained about "inadequate staffing" and "short staffing," and on one occasion, complained to Frakes that only she and one certified nurse's aide were on duty.[35]  Balfour's general opinions about "inadequate staffing" and "short staffing" are insufficient, standing alone, to establish the necessary violation.  See Goodman, 276 Kan. at 592, 78 P.3d at 822-23 (retaliatory discharge claim based on personal opinion of wrongdoing troubling).  To allow retaliatory discharge claims based on personal opinion "would effectively do away

---

[35]     Balfour's complaint to Frakes is sufficient to overcome defendant's argument that she did not complain to a "higher authority, either inside or outside of the company."  See Fowler v. Criticare Home Health Servs., Inc., 27 Kan. App.2d 869, 876, 10 P.3d 8, 15 (2001).  The record contains evidence that Clayborn (a licensed practical nurse) and Baar (director of nursing at defendant's Post-Acute Center) were responsible for the nursing schedule and the number of employees on staff at a given time. Assuming that the Center was understaffed, Balfour's complaints to Frakes, defendant's regional manager and the Center's interim administrator, qualify as complaints to an authority higher than the wrongdoers. See Goenner v. Farmland Indus., Inc., 175 F. Supp.2d 1271, 1280 (D. Kan. 2001).

with the employment-at-will doctrine." Id. Balfour's only quantifiable complaint was that on one occasion only two nurses (Balfour and a certified nurse's aide) were working in Balfour's unit. Because Balfour and the nurse's aide are both "nursing personnel" within the meaning of Section 28-39-144(oo) of the Kansas Administrative Regulations, and because Balfour's unit had no more than 40 patients at any given time, the unit was adequately staffed under applicable regulations at the time reference in Balfour's complaint. The record contains no evidence that a reasonably prudent person would have concluded that defendant was violating Section 28-39-154 of the Kansas Administrative Regulations. Defendant is therefore entitled to summary judgment on Balfour's claim that defendant terminated her employment because she reported inadequate staffing.

### ii. Resident Neglect

Balfour claims that she engaged in whistleblowing by reporting defendant's neglect in failing to protect resident J.M. from pulling over a cabinet and fracturing his leg. The record contains evidence that during the renovation, Balfour told Kopp (the Center administrator) and O'Neal (defendant's interior designer) about the risk of injury to residents who might pull on the unanchored cabinets. In fact, Balfour's complaint to O'Neal specifically mentioned J.M. The record also contains evidence that after the accident, Balfour discussed her concerns with McCormick.

Balfour's claim is predicated on the Adult Care Homes Licensure Act ("ACHLA"), K.S.A. § 39-923 et seq., which provides that "[i]t shall be unlawful in any adult care home to . . . permit . . . neglect . . . of any resident." K.S.A. § 39-939(b).[36] Under the ACHLA, neglect is defined as follows:

---

[36]     Balfour also cites Sections 39-940 and 39-1401(n) of the Kansas Administrative
(continued...)

> The failure or omission by one's self, caretaker, or another person with a duty to provide goods or services which are reasonably necessary to ensure safety and well-being and to avoid physical or mental harm or illness.

K.S.A. § 39-1401(g).  Defendant argues that the ACHLA is not specific enough to form the basis of a whistleblower claim.

The Kansas Supreme Court has stated that a retaliatory discharge action cannot be maintained "[w]ithout a clear mandate of public policy." Goodman, 276 Kan. at 593, 78 P.3d at 823.  In Goodman, a hospital terminated a nurse who had revealed confidential patient information to an attorney as part of an investigation into a negligence claim against the hospital.  The nurse filed suit alleging that the hospital had violated Kansas public policy because it had terminated her employment for reporting violations of the Kansas Nurse Practice Act ("KNPA"), K.S.A. §  65-1113, et seq., relating to hospital negligence.  Specifically, the nurse argued that she was reporting violations pursuant to K.S.A. § 65-1120(a)(3), which provides that a nursing license can be revoked or suspended if the nurse is found to have committed an act of professional incompetency, which is defined by K.S.A. § 65-1120(e) as follows:

> (1) one or more instances involving failure to adhere to the applicable standard of care to a degree which constitutes gross negligence, as determined by the board;
> (2) repeated instances involving failure to adhere to the applicable standard of care to a degree which constitutes ordinary negligence, as determined by the board; or
> (3) a pattern of practice or other behavior which demonstrates a manifest incapacity or incompetence to practice nursing.

The Kansas Supreme Court disagreed, holding that the KNPA cannot form the basis of a retaliatory

---

[36](...continued)
Regulations.  These regulations make it unlawful to file a false report with the State.  Because Balfour makes no claim that she reported any false reports to the State, these regulations do not support her whistleblower claim.

discharge claim under Kansas common law because the Act does not provide specific rules, regulations or laws. Id.. at 593, 78 P.3d at 823. Specifically, it stated that "[t]he KNPA requires nurses to adhere to the applicable standard of care, which turns on the facts in each case," and that "[p]ublic policy cannot be determined on a subjective basis." Id. at 592, 78 P.3d at 822-23. Goodman noted that violations of the KNPA are based on personal opinions of wrongdoing, and that "[i]t would be troublesome and unsettling to the state of the law if we were to allow a retaliatory discharge claim to be based on personal opinion of wrongdoing." Id. Such claims, Goodman predicted, "would effectively do away with the employment-at-will doctrine." Id. It therefore affirmed summary judgment for the hospital, concluding as follows:

> To support a retaliatory discharge claim, the public policy must be so definite and fixed that its existence is not subject to any substantial doubt. Because the KNPA does not provide definite or specific rules, regulations, or laws, it cannot be the basis for a retaliatory discharge claim. Without a clear mandate of public policy as a foundation for [plaintiff's] claims, she cannot establish the first element in a retaliatory discharge action.

Id.. at 593, 78 P.3d at 823 (internal quotations and citations omitted).

At this time, the Court declines to hold that as a matter of law, Section 39-1401(g) of the ACHLA fails to provide a "clear mandate of public policy," so that Balfour cannot maintain a cause of action.

Even if the ACHLA provides sufficiently specific rules, regulations or laws to support a whistleblower claim, the statutory remedy provided by the Kansas Risk Management Act ("KRMA"), K.S.A. § 65-4921 et seq., appears to preclude Balfour's common law retaliatory discharge claim. In Flenker v. Willamette Indus., Inc., 266 Kan. 198, 967 P.2d 295 (1998), the Kansas Supreme Court stated that an adequate statutory remedy precludes a common-law retaliatory discharge claim.[37]   See id.

---

[37]   The Kansas Supreme Court recognized the alternative remedies doctrine, which provides

(continued...)

33

at 209-10, 967 P.2d at 303.  In <u>Goodman</u>, the Kansas Supreme Court specifically considered the KMRA's preclusive effect on common-law retaliatory discharge claims.[38]  276 Kan. at 593-95, 78 P.3d at 823-24.  It concluded that the KMRA enhances the common-law retaliatory discharge remedy by allowing for punitive damages and attorney's fees, and provides an adequate statutory remedy for retaliation or discrimination claims based on reporting standard of care issues in medical care facilities, thereby precluding common-law whistleblower claims for such reporting.  <u>Id.</u> at 594-95, 78 P.3d at 824.

Balfour's whistleblowing in this case consisted of reports that defendant breached its standard of care by failing to provide reasonably necessary safety measures to protect J.M. in violation of Sections 39-939(b) and 39-1401(g) of the ACHLA.  Balfour's reports would appear to be precisely the

--------------------------------------------------

[37](...continued)
that a state or federal statute will be substituted for a state retaliation claim if the substituted statute provides an adequate alternative remedy.  <u>Flenker</u>, 266 Kan. at 202-03, 967 P.2d at 299.  Though <u>Flenker</u> involved the adequacy of Section 11(c) of the Occupational Safety and Health Act, 29 U.S.C. § 660(c)(2), the Kansas Supreme Court recognized the general applicability of the alternative remedies doctrine in whistleblowing cases where a statute provides an adequate remedy.  <u>Id.</u> at 203-04, 967 P.2d at 300.

[38]     Specifically, <u>Goodman</u> noted that the KMRA protects health care employees from discharge or discrimination for reporting any incident that "[i]s or may be below the applicable standard of care and has a reasonable probability of causing injury to a patient" or "may be grounds for disciplinary action by the appropriate licensing agency."  276 Kan. at 593, 967 P.2d at 823 (citing K.S.A. § 65-4921(f); K.S.A. § 65-4928).  The Kansas Supreme Court then evaluated the adequacy of the remedy for unlawful retaliation afforded by the KMRA under K.S.A. § 65-4928(b), which provides as follows:

> Any employer who violates the provisions of subsection (a) shall be liable to the aggrieved employee for damages for any wages or other benefits lost due to the discharge or discrimination plus a civil penalty in an amount not exceeding the amount of such damages. Such damages and civil penalty shall be recoverable in an individual action brought by the aggrieved employee.  If the aggrieved employee substantially prevails on any of the allegations contained in the pleadings in an action allowed by this section, the court, in its discretion, may allow the employee reasonable attorney fees as part of the costs.

sort protected under the KMRA, which appears to provide an adequate remedy for her whistleblower activity.  Her common-law claim of retaliatory discharge for reporting resident neglect would therefore appear to be precluded by the KMRA.  Because the parties have not directly addressed this issue in the summary judgment briefs, the Court orders Balfour to **show cause in writing on or before December 21, 2006**, why the KMRA does not preclude her common-law retaliatory discharge claim and why defendant is not entitled to summary judgment on that claim.  See Hutchings v. Kuebler, 5 F. Supp.2d 1186, 1199 (D. Kan. 1998).  Defendant may respond no later than **December 28, 2006**.

## II.     Patricia Clayborn's Claims

Clayborn asserts that defendant terminated her employment by refusing to schedule her after September 25, 2004, in violation of public policy under Kansas common law.  Specifically, she argues that defendant wrongfully terminated her employment on September 25, 2004, because she (1) blew the whistle on inadequate staffing, (2) blew the whistle on illegal staffing, (3) blew the whistle on failure to provide adult diapers and (4) refused to administer medication which she believed had been illegally prescribed.

### A.     Whistleblowing Retaliation

Clayborn claims that defendant terminated her employment on September 25, 2004, in violation of Kansas public policy and common law, because she reported (1) inadequate staffing; (2) illegal staffing; and (3) failure to provide adult diapers to residents.  The prima facie elements of these whistleblower claims are identical.  Defendant challenges the first element – whether a reasonably prudent person would have concluded that it was violating rules, regulations or the law pertaining to public health, safety and general welfare.  Specifically, defendant argues that (1) Clayborn cannot identify specific rules, regulations or laws which it allegedly violated, and (2) a reasonable person would not have concluded that it was violating any

35

such rules, regulations or laws.  Defendant also challenges the fourth element – whether employee was discharged – arguing that its decision not to schedule Clayborn was not a discharge because she was working as needed.

### i.    Inadequate Staffing And Illegal Staffing

Clayborn argues that she engaged in protected activity by reporting inadequate and illegal staffing.  These claims are premised on Section 28-39-154 of the Kansas Administrative Regulations, outlined above.  As noted above, this regulation sets minimum staffing requirements for facilities such as the Center, and is specific and definite enough to form the basis of a whistleblower claim under Kansas common law.

Defendant is correct, however, that a reasonable person would not have concluded that it was violating the applicable regulation.  Clayborn complained to Frakes and Cox about "staffing concerns," including her concern that the Center was "short staffed" and used "staff from other facilities to pad numbers," i.e. "cross-clocking."  Clayborn also complained to state surveyors about "inadequate staffing to meet the needs of the Alzheimer's residents."  Like Balfour's general complaints of inadequate staffing, Clayborn's complaints of inadequate staffing boil down to her personal opinion, which cannot support a retaliatory discharge claim under Kansas law.  See Goodman, 276 Kan. at 592, 78 P.3d at 822-23 (personal opinion that understaffing resulted in problems with resident care does not create causal connection necessary to find violation of applicable law).  The record contains no competent evidence of staffing levels from which a reasonable person would conclude that defendant violated Section 28-39-154

36

of the Kansas Administrative Regulations.[39]   Defendant is therefore entitled to summary judgment on

Clayborn's claim that it terminated her employment because she reported inadequate or illegal staffing.

### ii.   Failure To Provide Incontinent Briefs

Clayborn argues that she engaged in protected activity by reporting defendant's failure to

provide adult diapers to its residents.  This claim is premised on Section 28-39-152(b) of the Kansas

Administrative Regulations, which provides as follows:

> Urinary Incontinence.  The facility shall ensure all of the following:
> (1) Residents who are incontinent at the time of admission or who become incontinent after admission are assessed, and based on that assessment a plan is developed and implemented to assist the resident to become continent, unless the resident's clinical condition demonstrates that incontinency is unavoidable.
> (2) Residents who are incontinent receive appropriate treatment and services to prevent urinary tract infections.
> (3) Residents who are admitted to the facility without an indwelling catheter are not catheterized, unless the resident's clinical condition demonstrates that catheterization is necessary.
> (4) Residents with indwelling catheters receive appropriate treatment and services to prevent urinary tract infections and to restore normal bladder function, if possible.

The regulation does not mandate that incontinent briefs be provided to residents.  Instead, it

demands that if possible, assessment plans be created and implemented to help residents become continent.

It is uncontroverted that defendant implemented a toileting program designed for this very purpose.  The

debate between toileting and incontinent briefs is simply a debate about company practice, which is

insufficient to support a whistleblower claim.  See Fowler, 27 Kan. App.2d 869, 876, 10 P.3d 8, 15

---

[39]      Because Clayborn's "cross-clocking" claim is predicated on Section 28-39-154 of the Kansas Administrative Regulations, which does not prohibit cross-clocking, Clayborn's illegal staffing claim is a misnomer.  As with her inadequate staffing claim, Clayborn must show that a reasonable person could conclude that through cross-clocking or otherwise, staffing levels at the Center fell below the regulation-mandated minimum.  Clayborn has no competent evidence in this regard.

(Palmer not meant to endow every workplace dispute on company practices and government regulation with whistleblower overtones).

Furthermore, the record does not reveal a genuine issue of material fact whether a reasonable person would conclude that defendant had violated the regulation. On this record, plaintiff has not demonstrated a genuine issue of material fact whether defendant's toileting program satisfies the requirement that it develop an incontinence plan, whether incontinent residents received appropriate treatment to prevent urinary tract infections or whether defendant's program complies with subsections (3) and (4). Because Clayborn has not demonstrated a genuine issue of material fact whether a reasonable person would conclude that defendant had violated the regulation, defendant is entitled to summary judgment on Clayborn's claim that it terminated her employment because she reported the Center's failure to provide incontinent briefs.

### B.    Refusal To Perform An Illegal Act

Clayborn claims that defendant terminated her employment on September 25, 2004, in violation of Kansas public policy and common law, because she refused to administer illegally- prescribed medication.  Defendant argues that it is entitled to summary judgment because (1) wrongful termination for refusal to perform an illegal act is not a recognized exception to the doctrine of employment at will under Kansas law; and (2) the KRMA precludes such a claim.

The recognized exceptions to the doctrine of employment-at-will under Kansas law are narrow, and this Court is in no position to expand the scope of such exceptions. Aiken, 886 F. Supp. at 1573. Kansas courts have not recognized an exception to the employment-at-will doctrine for an employee who

38

refuses to perform an illegal act.[40]  Indeed, refusing to perform a task, even in the belief that it is unlawful, does not constitute a protected activity under Kansas public policy. McCauley v. Raytheon Travel Air Co., 152 F. Supp.2d 1267, 1275-76 (D. Kan. 2001).  Clayborn attempts to distinguish McCauley, arguing that it involved an uncertain violation of the law, while the present case involves a "much less nebulous" violation. McCauley's holding is unambiguous, however, and does not turn on the certainty of the violation in question.

Here, the record contains no evidence that Clayborn reported to a higher authority any illegal administration of medication.  Because she did not do so (thereby transforming her claim into a whistleblower claim), Clayborn cannot assert a retaliatory discharge claim under Kansas common law. See id. at 1276.  Defendant is therefore entitled to summary judgment on Clayborn's claim that it terminated her employment because she refused to administer medication which she believed to be illegally prescribed.[41]

## III.    Barbara Gatson's Claims

### A.    Discriminatory Termination Under Section 1981

Gatson claims that on December 8, 2003, in violation of 42 U.S.C. § 1981, defendant discharged her on the basis of race.  Section 1981 "affords a federal remedy against discrimination in private

---

[40]    While arguing that her claim is "cognizable under Kansas law," Clayborn cites no authority for this proposition.

[41]    Because the Court determines that this claim is not a recognized exception to the employment at will doctrine in Kansas, the Court need not determine whether the KMRA precludes the claim.

employment on the basis of race."[42] <u>Johnson v. Ry. Express Agency, Inc.</u>, 421 U.S. 454, 459-60 (1975).

More specifically, Section 1981 protects employees from racial discrimination both in entering into an

employment contract and in enjoying the benefits, privileges, terms and conditions of employment. <u>Exum</u>

<u>v. U.S. Olympic Comm.</u>, 389 F.3d 1130, 1134 (10th Cir. 2004). Without direct evidence of

discrimination, plaintiffs' Section 1981 claims are subject to the three-part burden-shifting framework of

<u>McDonnell Douglas</u>. <u>See</u> <u>Hysten v. Burlington N. & Santa Fe Ry. Co.</u>, 296 F.3d 1177, 1183 (10th Cir.

2002).

Because Gatson offers no direct evidence of discrimination, the Court will consider her claim under

<u>McDonnell Douglas</u>. For the purposes of this motion, defendant concedes that Gatson has established a

prima facie case of discrimination under Section 1981.[43] The Court therefore considers the stated reasons

for Gatson's termination.

Defendant argues that Kopp terminated Gatson for negative attitude and insubordination when

Glynn instructed the nursing staff to perform activities with Alzheimer's patients. Gatson does not dispute

the legitimacy of defendant's proffered reason, and insubordination does constitute a legitimate,

nondiscriminatory basis for employment termination. <u>See</u> <u>Ray v. Safeway Stores, Inc.</u>, 614 F.2d 729, 731

---

[42]     Section 1981(a) provides in pertinent part as follows:

All persons within the jurisdiction of the United States shall have the same right in every State
and Territory . . . to the full and equal benefit of all laws and proceedings for the security of
persons and property as is enjoyed by white citizens, and shall be subject to like punishment,
pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

[43]     To establish a prima facie case of race discrimination under Section 1981, plaintiff must
show that he or she (1) belongs to some protected class; (2) was qualified for the position or benefit at
issue; (3) suffered an adverse employment action; and (4) was treated less favorably than others (e.g., the
position at issue remained open after the adverse employment action). <u>Exum</u>, 389 F.3d at 1134.

(10th Cir. 1980) (termination of employee for failure to comply with direct order of supervisor constitutes legitimate, nondiscriminatory reason).

Because defendant has put forth a legitimate, nondiscriminatory reason for terminating Gatson's employment, Gatson has the burden to show that such reason is pretextual.  Gatson argues that it is pretextual because (1) defendant has offered varied and inconsistent reasons for her termination; (2) Kopp, who signed the termination form, was not the decisionmaker; (3) the decisionmakers, Frakes and Baar, made statements probative of racial bias; and (4) the stated reason for her termination is without merit.

As to varied and inconsistent reasons, Gatson argues that defendant has variously claimed that it terminated her employment because she (1) created a hostile work environment and (2) did not carry out duties requested of her.  Generally, pretext is not shown simply by arguing that defendant has offered multiple reasons for terminating an employee.  See Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1310 (10th Cir. 2005) (en banc) (plaintiff must generally disprove each justification of employer).  The claim that Gatson created a hostile work environment was noted on her employee termination form.  The charge stemmed from a mistaken report that Gatson made the comment "yes, sir, master" to another employee.  This mistaken charge is not evidence of pretext.  See Williams v. Potter, 331 F. Supp.2d 1331, 1345 (D. Kan. 2004) (mistake not evidence of intentional discrimination).  As soon as Kopp learned of the mistake, during her meeting with Gatson on December 8, 2004, she drew a line through the charge and noted "error DK."  Defendant has not cited the comment as a basis for termination, and Kopp's affidavit and notation clearly show that she did not rely on it in terminating Gatson's employment.  Gatson offers no evidence from which a reasonable jury might find that the hostile work environment charge is evidence of pretext.

Defendant's claim that Gatson did not carry out duties requested of her was made in its response to her claim for unemployment benefits. This claim is identical to the reason stated on the termination offered in her termination form: "insubordination – refused to carry out direct instruction from supervisor." Defendant's response to Gatson's unemployment claim is not an inconsistent statement which is evidence of pretext.

Gatson argues that Frakes and Baar decided to terminate her employment, and cites discriminatory statements by them as evidence of pretext. Kopp's affidavit clearly states that she possessed decisionmaking authority and that she made the decision to terminate Gatson's employment. Gatson's evidence to the contrary is that Frakes and Baar openly targeted her for termination at a meeting which Kopp attended in November of 2003. At this meeting, Frakes and Baar told McCormick to terminate employees, including Gatson, by "pissing in their Cheerios." This evidence creates an inference that Frakes and Baar were involved in the decision to terminate Gatson's employment, even if they were not the ultimate decisionmakers. The record contains evidence that Frakes referred to Gatson as a "nigger," and that Baar once told McCormick that she had too many "Africans" working at the Center. This evidence would allow a reasonable jury to impute discriminatory intent to defendant. See Brooks v. Barnhart, 78 Fed. Appx. 52, 54 n.1 (10th Cir. 2003) (citing Bergene v. Salt River Project Agric. Improvement & Power Dist., 272 F.3d 1136, 1141 (9th Cir. 2001)) (even if manager not ultimate decisionmaker, manager's motives imputed to company if manager involved in employment decision); see also Walker v. Faith Techs., Inc., 344 F. Supp.2d 1261, 1277 (D. Kan. 2004) (discriminatory statements directed at plaintiff or regarding defendant's employment policies create nexus between discriminatory statements and employment decision). The statements of Frakes and Baar evince racially discriminatory intent, and create a genuine

issue of material fact whether defendant's stated reason for Gatson's termination was pretext for unlawful discrimination.

Gatson also argues as evidence of pretext that defendant's stated reason for termination was without merit. During her meeting with Gatson on December 8, 2004, Kopp told Gatson that she did not believe the insubordination charge which defendant now offers as its stated reason for termination. Kopp's admission is sufficient to create a genuine issue of material fact with regard to pretext in this case. See Stover, 382 F.3d at 1076 (defendant must honestly believe stated reason and act in good faith on such reason); Morgan, 108 F.3d at 1323 (contradiction in stated reason for termination evidence of pretext); see also Little v. Ill. Dep't of Revenue, 369 F.3d 1007, 1015 (7th Cir. 2004) (analysis of pretext focuses on what decisionmaker sincerely believed); Town & Country Toyota, 2001 WL 369675, at *4 (contradiction between proffered explanation and supervisor's statements convincing evidence of pretext). This evidence creates a genuine issue of material fact whether defendant's stated reason is unworthy of belief and a pretext for discriminatory intent.

Because a reasonable jury could find that defendant's proffered reason for termination is unworthy of belief and a pretext for discrimination, defendant is not entitled to summary judgment on Gatson's claim that defendant terminated her employment on the basis of race in violation of 42 U.S.C. § 1981.

## B.    Wrongful Discharge Under Kansas Common Law

Gatson asserts two claims of wrongful discharge in violation of public policy under Kansas common law. Specifically, she argues that defendant wrongfully terminated her employment on December 8, 2003, because she blew the whistle on inadequate staffing and resident neglect.

The prima facie elements of these whistleblower claims are identical. Defendant challenges the first

and second prima facie elements of Gatson's whistleblower claims.  With regard to the first element –

whether a reasonably prudent person would have concluded that defendant was violating rules, regulations

or the law pertaining to public health, safety and general welfare – defendant argues that (1) Gatson cannot

identify specific rules, regulations or laws which it allegedly violated, and (2) a reasonable person would not

have concluded that it was violating any such rules, regulations or laws.  With regard to the second element

– whether the whistleblowing was done in good faith – defendant argues that Gatson did not report her

claims to company management or law enforcement officials.

### i.      Inadequate Staffing

Gatson argues that she engaged in protected activity by reporting defendant's inadequate

staffing.  Like the previous inadequate staffing claims, this claim is predicated on Section 28-39-154 of the

Kansas Administrative Regulations, outlined above.  As noted above, this regulation is specific and definite

enough to form the basis of a whistleblower claim under Kansas common law because the regulation sets

minimum staffing requirements for facilities such as the Center.

As noted above, however, defendant has not demonstrated a genuine issue of material fact whether

a reasonable person could conclude that it violated the applicable regulation.  Gatson generally complained

of staff shortages to Frakes, McCormick and Lange.[44]  Based on her perception of inadequate staffing,

---

[44]      Gatson's complaints to Frakes and McCormick are sufficient to overcome defendant's argument that she did not complain to a "higher authority, either inside or outside of the company." See Fowler, 27 Kan. App.2d at 876, 10 P.3d at 15.  The record contains evidence that Clayborn (a licensed practical nurse) and Baar (director of nursing at defendant's Post-Acute Center) were responsible for the nursing schedule and the number of employees on staff at a given time.  Assuming that the Center was understaffed, Gatson's complaints to Frakes, defendant's regional manager and the Center's interim administrator, and McCormick, the Center's director of nursing, qualify as complaints to authorities higher

(continued...)

Gatson believed that residents were not receiving adequate care. Gatson's general complaints and concerns were based on personal opinion, however, and do not provide evidence from which a reasonable person might find a violation of the regulation in question. See Goodman, 276 Kan. at 592, 78 P.3d at 822-23 (personal opinion that understaffing resulted in problems with resident care does not create causal connection necessary to find violation of applicable law). Gatson also complained more specifically to McCormick that she could not work effectively when Baar scheduled only one nurse and three aides, but Gatson admits that she had no knowledge of staffing levels required by law. Because Gatson's unit had no more than 40 residents at any given time, however, one nurse and three aides would more than satisfy the minimum staffing requirement of Section 28-39-154 of the Kansas Administrative Regulations. The record contains no evidence from which a reasonable person might believe that defendant violated Section 28-39-154, and defendant is therefore entitled to summary judgment on Gatson's claim that it terminated her employment in violation of Kansas common law because she reported the Center's inadequate staffing.

### ii. Resident Neglect

Gatson argues that she engaged in protected activity by reporting defendant's negligence in failing to prevent the accident involving J.M. Gatson's claim is predicated on Sections 39-939(b) and 39-1401(g) of the ACHLA.[45] Like Balfour's claim of whistleblowing involving resident neglect, Gatson's

---

[44](...continued)
than the wrongdoers. See Goenner, 175 F. Supp.2d at 1280.

[45]     Like Balfour, Gatson also cites Sections 39-940 and 39-1401(n) of the Kansas Administrative Regulations in support of her whistleblower claim regarding resident neglect. Again, these regulations make it unlawful to file a false report with the State. Because Gatson makes no claim that she
(continued...)

common-law claim of retaliatory discharge for reporting resident neglect appears to be precluded by the KMRA.  Accordingly, the Court orders Gatson to **show cause in writing on or before December 21, 2006**, why the KMRA does not preclude her common-law retaliatory discharge claim and why defendant is not entitled to summary judgment on that claim.  See Hutchings v. Kuebler, 5 F. Supp.2d 1186, 1199 (D. Kan. 1998).  Defendant may respond no later than **December 28, 2006**.

## IV.      Rhonda Williams' Claims

### A.        Discriminatory Termination and Retaliation Under Section 1981

Williams claims that on January 14, 2004, in violation of Section 1981, defendant (1) constructively terminated her employment because of her association with her African-American husband, and (2) retaliated by constructively terminating her employment because of her opposition to Frakes' racially derogatory statements.  At the outset, defendant briefly suggests that Williams' claims are not cognizable under Section 1981 because she is Caucasian.  The Court disagrees.  See Phelps v. Wichita Eagle-Beacon, 886 F.2d 1262, 1267 (10th Cir. 1989) (alleged discrimination against white person because of association with African-Americans may state cause of action under Section 1981); Skinner v. Total Petroleum, Inc., 859 F.2d 1439, 1447 (10th Cir. 1988) (white employee discharged for becoming involved in racial situation may bring suit under Section 1981).  As noted above, the Court will evaluate plaintiff's Section 1981 claims under the burden-shifting framework of McDonnell Douglas.

For Williams to establish her prima facie cases of discriminatory termination and retaliation, she must show that she suffered adverse employment action.   See Exum, 389 F.3d at 1134 (discriminatory

---

[45](...continued)
reported any false reports to the State, these regulations do not support her whistleblower claim.

termination); Roberts v. Roadway Express, Inc., 149 F.3d 1098, 1103 (10th Cir. 1998) (retaliation).  As

adverse employment action, plaintiff cites the constructive termination of her employment.[46] Williams argues

that her working conditions were so intolerable that a reasonable person would have felt forced to resign.

Defendant argues that it did not constructively discharge Williams and that she resigned of her own free will.

A true constructive discharge equates to a formal discharge in the context of race discrimination

claims, see Pa. State Police v. Suders, 542 U.S. 129, 141 (2004), and termination of employment

constitutes adverse employment action,  see Pacheco v. Whiting Farms, Inc., 365 F.3d 1199, 1206

(10th Cir. 2004).  To support a constructive discharge claim, plaintiff must show that her working conditions

became so intolerable that a reasonable person in her position would have felt compelled to resign.  Suders,

542 U.S. at 141.  The employer's illegal discriminatory acts must make the conditions of employment

objectively intolerable, Watson v. Lucent Techs., Inc., 92 F. Supp.2d 1129, 1135 (D. Kan. 2000) (citing

Sanchez v. Denver Pub. Sch., 164 F.3d 527, 534 (10th Cir. 1998)), and the voluntariness of plaintiff's

───────────────

[46]     Independent of her constructive discharge argument, Williams also argues that she suffered
adverse employment action because defendant (1) invalidly suspended her employment; (2) humiliated her
by touching her with a hydrogener; and (3) labeled her a troublemaker after she resigned.  The pretrial
order identifies Williams' claims, however, as "[d]iscriminatory constructive discharge based on her
association with her African-American husband," and "retaliatory constructive discharge based on her
opposition to Frakes' racially derogatory statements."  Pretrial Order (Doc. #185) filed August 23, 2006,
at 14.
       The pretrial order is the controlling document for trial, Expertise Inc. v. Aetna Fin. Co., 810 F.2d
968, 973 (10th Cir. 2002); see also Fed. R. Civ. P. 16(a), and claims not included in the pretrial order are
waived, see Wilson v. Muckala, 303 F.3d 1207, 1215 (10th Cir. 2002).  Here, the pretrial order contains
no independent claim that defendant violated Section 1981 by suspending, humiliating or labeling Williams;
these allegations are components of Williams' claim that defendant constructively discharged her.
Therefore, the Court will not consider defendant's actions – which might or might not otherwise constitute
adverse employment actions – as anything but evidence of constructive discharge.  See Reynolds v. Sch.
Dist. No. 1, Denver, Colo., 69 F.3d 1523, 1534 n.16 (10th Cir. 1995).

resignation is determined under the totality of the circumstances, Lighton v. Univ. of Utah, 209 F.3d 1213, 1222 (10th Cir. 2000). The bar is quite high in constructive discharge cases; plaintiff must show that she had no choice but to quit. Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1221 (10th Cir. 2002).

As evidence that she had no choice but to quit, Williams' argues that (1) Frakes and Baar targeted her for termination in November of 2003; (2) Frakes singled her out based on her association with an African-American; (3) Frakes touched her with a hydrogener in front of other staff; (4) McCormick actively solicited her resignation; (5) McCormick suspended her without cause; (6) Garbin verbally threatened and harassed her; (7) McCormick threatened to attach negative reports to her license; (8) a Union representative told her that the Union contract was no longer valid, and refused to assist her; (9) the NLRB found multiple infractions against defendant; and (10) after she resigned, defendant labeled her a "troublemaker" and determined that she should not be rehired.

Much of Williams' evidence is irrelevant to her constructive discharge claim. Although the evidence that Frakes and Baar targeted Williams for termination in November of 2003 suggests that Frakes and Baar disliked Williams, plaintiff has not shown that their dislike created objectively intolerable working conditions. See Baca v. Sklar, 398 F.3d 1210, 1216 (10th Cir. 2005) (in evaluating constructive discharge claim, court ignores employer's subjective intentions); Burns v. AAF-McQuay, Inc., 96 F.3d 728, 733-34 (4th Cir. 1996) (employer's dislike of employee, by itself, does not support inference that employee was constructively discharged).

The Union's refusal to assist Williams is irrelevant to her constructive discharge claim, which must be premised on defendant's conduct which created the intolerable working conditions. See MacKenzie v. City & County of Denver, 414 F.3d 1266, 1281 (10th Cir. 2005) (constructive discharge occurs when

48

employer deliberately makes or allows working conditions to become so intolerable that employee has no choice but to quit); Smitley v. Cigna Corp., 640 F. Supp. 397, 400 (D. Kan. 1986) (constructive discharge requires proof that employer intended to and deliberately rendered working conditions intolerable). Here, a Union representative informed Williams that the Union could not assist her because the Union contract had expired. Even if this position was unlawful or incorrect, the record contains no evidence that defendant was responsible for the Union's refusal or undertook any deliberate act to deny Williams the benefit of Union representation. Because the Union's refusal to assist Williams was an independent act which is not attributable to defendant, it cannot form the basis of a constructive discharge claim against defendant. See Cooper v. Wyeth Ayerst Lederle, 106 F. Supp.2d 479, 501 (S.D.N.Y. 2000) (plaintiff may not bootstrap theoretically separate claim against union onto constructive discharge claim against employer).

Williams argues that defendant constructively discharged her through a rule which prohibited employees from discussing wages, hours and other terms and conditions of employment, and an open invitation to "sign and resign" if unsatisfied with company policy. Williams notes that McCormick told the entire group of nurses that if the key to the narcotics cart came up missing, she would "attach it" to their licenses. Even if the Court were to assume that these policies and warnings created an unfriendly work environment, they do not amount to a constructive discharge. See Exum, 389 F.3d at 1135 (constructive discharge requires employer to create forced choice between employment and resignation); Yearous v. Niobrara County Mem'l Hosp., 128 F.3d 1351, 1357 (10th Cir. 1997) (working conditions must be more than just difficult or unpleasant to establish constructive discharge). The record contains no evidence that any other employee resigned because of defendant's policies or warnings, which undercuts Williams' claim that such policies and warnings created an objectively intolerable workplace. Sinclair v. Kmart Corp.,

49

No. 95-1170-JTM, 1997 WL 45350, at *5 (D. Kan. Feb. 3, 1997) (finding no constructive discharge where other employees worked under same conditions without difficulty).

The fact that defendant labeled Williams a troublemaker after her resignation is also irrelevant. Because defendant did not label Williams a troublemaker while she was actually employed, it stands to reason that this action had no bearing on the tolerability of her working conditions.  See Barkauskie v. Indian River Sch. Dist., 951 F. Supp. 519, 532 (D. Del. 1996) (actions taken after resignation have no bearing on constructive discharge inquiry).

Williams' remaining evidence does not rise to a level which would support her constructive discharge claim.  To prove constructive discharge based on harassment, Williams must demonstrate a greater severity or pervasiveness of harassment than the minimum required to support a hostile working environment.  Mart v. Dr Pepper Co., 923 F. Supp. 1380, 1390 (D. Kan. 1996); see also Zisumbo v. McCleodUSA Telecomms. Servs., Inc., 154 Fed. Appx. 715, 729 (10th Cir. 2005) (working conditions for constructive discharge must be even more egregious than high standard for hostile work environment). Williams' evidence fails to create a genuine issue of material fact in this respect.

Frakes' conduct toward Williams is insufficient to establish constructive discharge. Williams argues that Frakes singled her out, based on her association with her African-American husband, by describing African-Americans as "basically lazy" and responding, "oh, you're the one married to the black man," when Williams confronted Frakes about her statement.  This single, discrete exchange falls well short of establishing intolerable working conditions.  See Sprague v. Thorn Ams., Inc., 129 F.3d 1355, 1366-67 (10th Cir. 1997) (five harassing comments over 16-month period not sufficient for constructive discharge); Tipton v. City of Hutchinson, 68 F. Supp.2d 1239, 1244 (D. Kan. 1999) (comments alleged as basis for

constructive discharge must be more than simply offensive to reasonable person); Loum v. Houston's Rests., Inc., 985 F. Supp. 1315, 1321 (D. Kan. 1997) (two inappropriate comments do not establish hostile work environment, let alone constructive discharge). Even when coupled with the hydrogener incident, Frakes' conduct does not demonstrate a genuine issue of material fact regarding an intolerable work environment. See Penry v. Fed. Home Loan Bank of Topeka, 155 F.3d 1257, 1261, 1264 (10th Cir. 1998) (harassing comment and four separate instances of unwanted physical contact insufficient to establish constructive discharge).

Baar's conduct toward Williams is also insufficient to create a genuine issue of material fact with regard to constructive discharge. The record does not support Williams' argument that McCormick actively solicited her resignation. McCormick's lone statement – telling Williams that she could resign if she did not like the way things were going – does not amount to constructive discharge. See Saville v. Int'l Bus. Machs. Corp., 188 Fed. Appx. 667, 670 (10th Cir. 2006) (supervisor's statement, "I want you out," not evidence of constructive discharge because employer's subjective intentions have no bearing on constructive discharge inquiry). The record also does not support Williams' argument that her suspension created a constructive discharge. The record contains no evidence that Williams was suspended without pay or under other circumstances which would suggest that her suspension was an adverse employment action. See Prickett v. Amoco Oil Co., 31 Fed. Appx. 608, 610 (10th Cir. 2002) (one-week suspension with pay does not qualify as significant change in employment status); see also Henderson v. United Parcel Serv., Inc., No. 04-01545-PFS-CBS, 2006 WL 1658690, at *10 (D. Colo. June 7, 2006) (five-day suspension not adverse employment action where plaintiff does not suffer loss of compensation or change in benefits or employment status). Because the record contains no evidence that Williams' suspension constituted

adverse employment action, the suspension does not create a genuine issue of material fact as to constructive discharge.  See Zisumbo, 154 Fed. Appx. at 729 (adverse employment action not necessarily sufficient to establish constructive discharge because constructive discharge requires showing that working conditions were intolerable, not simply adverse).  Even if the Court were to find that Williams' suspension constituted adverse employment action, the suspension does not amount to a constructive discharge.  See Allen v. Bridgestone/Firestone, Inc., 81 F.3d 793, 796-97 (8th Cir. 1996) (three-day suspension without pay not constructive discharge where employer accepts plaintiff back to work).

Finally, Garbin's conduct is insufficient to create a genuine issue of material fact with regard to constructive discharge.  At most, his statement – "I hold your job in the palm of my hand" – is a threat that Garbin could terminate Williams' employment.  This threat never materialized, and the record contains no evidence that it was ever credible.[47]  The statement does not suggest that Williams' working condition were intolerable.  See Parker v. Bd. of Regents, 981 F.2d 1159, 1162 (10th Cir. 1992) (to create constructive discharge, threat to terminate employee must amount to duress, leaving plaintiff no real choice but to resign).  Similarly, Garbin's statement that he would knock supplies off a shelf and make Williams pick them up does not suggest that Williams' working conditions were intolerable.  See Van Der Meulen v. Brinker Int'l, 153 Fed. Appx. 649, 657 (11th Cir. 2005) (employer's threats which never materialize do not support constructive discharge claim).

On this record, a reasonable jury would not conclude that Williams' working conditions were so objectively intolerable that a reasonable person would have no choice but to resign.  Therefore Williams

_____

[47]     The Court will not blindly infer that Garbin, director of nursing, had the authority to terminate Williams, a certified medication aide.

cannot establish her prima facie case of discrimination or retaliation under Section 1981, which require proof of adverse employment action.  As noted above, the pretrial order does not allege adverse employment action except with respect to constructive discharge.  Accordingly, defendant is entitled to summary judgment on Williams' claims that it terminated her employment in violation of Section 1981 because of her association with her African-American husband, and retaliated against her in violation of Section 1981 for opposing racially derogatory statements by Frakes.

**B.      Wrongful Discharge Under Kansas Law**

Williams asserts five claims of wrongful constructive discharge in violation of public policy under Kansas common law.  Specifically, she argues that defendant constructively terminated her employment because she (1) blew the whistle on failure to isolate infectious residents or warn staff of such residents, (2) blew the whistle on illegal destruction of documents and concealment of a resident's injury, (3) refused to falsely report the circumstances surrounding a resident's elopement, (4) refused to keep quiet about resident neglect and (5) refused to provide false information to State investigators regarding a resident's injury.

**i.      Whistleblowing Retaliation**

Williams claims that defendant terminated her employment in violation of Kansas public policy and common law, because she reported (1) failure to isolate infectious residents or warn staff of such residents in violation of Section 28-39-161(b) of the Kansas Administrative Regulations; and (2) illegal destruction of documents and concealment of resident neglect in violation of Sections 39-939 and 39-940 of the ACHLA.  The prima facie elements of these whistleblower claims are identical.  Defendant challenges the first, second and fourth prima facie elements of these claims.  With regard to the first element – whether

53

a reasonably prudent person would have concluded that defendant was violating rules, regulations or the law pertaining to public health, safety and general welfare – defendant argues that (1) Williams cannot identify specific rules, regulations or laws which it allegedly violated, and (2) a reasonable person would not have concluded that it was violating any such rules, regulations or laws.  With regard to the second element – whether the whistleblowing was done in good faith – defendant argues that Balfour did not report her claims to company management or law enforcement officials.  With regard to the fourth element – whether the employee was discharged in retaliation for making a report – defendant argues that it did not constructively terminate Williams' employment and that even if it did, a constructive discharge may not form the basis of a retaliatory discharge claim under Kansas law.  Because defendant's argument as to the fourth element is dispositive, the Court will address only that element of Williams' prima facie case.

A claim of retaliatory discharge in violation of Kansas public policy requires the plaintiff to show that defendant terminated his or her employment.  Kansas courts have neither recognized nor foreclosed a common-law claim of constructive retaliatory discharge.  See Marinhagen v. Boster, Inc., 17 Kan. App.2d 532, 539, 840 P.2d 534, 539-40 (1992) (whether employee terminated or voluntarily resigned is material fact in retaliatory discharge claim under Kansas law); cf. White v. Midwest Office Tech., Inc., 5 F. Supp.2d 936, 955 (D. Kan. 1998) (Kansas Supreme Court would not recognize constructive discharge as sufficient to state actionable claim for retaliatory discharge); Diepenbrock v. Bd. of Educ., No. 91-1212, 1994 WL 613421, at *8 (D. Kan. Oct. 4, 1994) (plaintiff cannot plead cause of action for constructive wrongful discharge under Kansas or federal law).  The Court need not belabor this issue because – for reasons previously addressed – Williams presents no evidence from which a reasonable jury could find that defendant constructively discharged her.  As noted above, the record does not create a

54

genuine issue of material fact whether Williams' working conditions were so intolerable that she had no choice but to quit.  See Marinhagen v. Boster, Inc., 17 Kan. App.2d 532, 539, 840 P.2d 534, 539-40 (1992) (employee who voluntarily resigns cannot maintain wrongful discharge claim under Kansas common law).  Accordingly, defendant is entitled to summary judgment on Williams' wrongful discharge claims.

### ii.       Refusal To Perform An Illegal Act

Williams claims that defendant terminated her employment in violation of Kansas public policy and common law, because she refused to (1) falsely report the circumstances of a resident's elopement, (2) keep quiet about resident neglect, and (3) provide false information to State investigators regarding J.M.'s injuries.[48]  Defendant argues that it is entitled to summary judgment because (1) wrongful termination for refusal to perform an illegal act is not a recognized exception to the doctrine of employment at will under Kansas law; and (2) the KRMA precludes such a claim.

As noted above, Kansas law does not recognize Williams' claim that defendant wrongfully discharged her for refusing to perform illegal acts.  See McCauley, 152 F. Supp.2d at 1275-76.  Although Williams argues otherwise, she cites no authority for her proposition.  Defendant is therefore entitled to summary judgment on those claims.[49]

---

[48]       Williams claims that Section 39-940 of the ACHLA prohibited her from filing a false report with the State and providing false information to State surveyors.  She does not specify which statute or regulation made it illegal to keep quiet about resident neglect.

[49]       Because the Court determines that this claim is not a recognized exception to the employment at will doctrine in Kansas, the Court need not determine whether the KMRA precludes the claim.

**IT IS THEREFORE ORDERED** that Defendant's Motion For Partial Summary Judgment [Plaintiff Barbara Gatson] (Doc. #188) filed August 29, 2006, be a hereby is **SUSTAINED IN PART**. The Court **SUSTAINS** the motion as to Gatson's claim of wrongful discharge under Kansas law in retaliation for reporting inadequate staffing.  The Court orders Gatson to show cause in writing on or before **December 21, 2006**, why the KMRA does not preclude her common-law retaliatory discharge claim and why defendant is not entitled to summary judgment on that claim.  Defendant may respond no later than **December 28, 2006**.  The motion is otherwise **OVERRULED**.  Gatson's claim that defendant terminated her employment in violation of 42 U.S.C. § 1981 remains in the case.

**IT IS FURTHER ORDERED** that Defendant's Motion For Partial Summary Judgment [Plaintiff Barbara Balfour] (Doc. #191) filed August 29, 2006, be and hereby is **SUSTAINED IN PART**.  The Court **SUSTAINS** the motion as to Balfour's claim of wrongful discharge under Kansas law in retaliation for reporting inadequate staffing.  The Court orders Balfour to show cause in writing on or before **December 21, 2006**, why the KMRA does not preclude her common-law retaliatory discharge claim and why defendant is not entitled to summary judgment on that claim.  Defendant may respond no later than **December 28, 2006**.  The motion is otherwise **OVERRULED**.  Balfour's claim of wrongful discharge in retaliation for filing a workers' compensation claim under Kansas common law remains in the case.

**IT IS FURTHER ORDERED** that Defendant's Motion For Partial Summary Judgment [Plaintiff Rhonda Williams] (Doc. #193) filed August 29, 2006, be and hereby is **SUSTAINED**.

**IT IS FURTHER ORDERED** that Defendant's Motion For Partial Summary Judgment [Plaintiff Patricia Clayborn] (Doc. #195) filed August 29, 2006, be and hereby is **SUSTAINED**.

Dated this 19th day of December, 2006 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge